209 So.2d 202

**Evelyn Leak Neeley STAPLETON**

v.

**W. D. STAPLETON, Jr.**

**I Div. 303.**

Supreme Court of Alabama.

March 14, 1968.

Rehearing Denied April 11, 1968.

Jas. R. Owen, Bay Minette, for appellee.

Chason, Stone & Chason, Bay Minette, for appellant.

COLEMAN, Justice.

The husband obtained a decree of divorce from the bonds of matrimony on the ground of voluntary abandonment and the wife appeals.

Appellant assigns error as follows:

"1. The final decree of the court rendered April 28, 1965, is contrary to the evidence in the case for that the Appellee failed to prove abandonment as alleged in his Bill of Complaint. (Transcript page 50)

"2. The final decree of the court rendered April 28, 1965, is contrary to the Law of the Case for that the Appellee failed to prove abandonment as alleged in his Bill of Complaint. (Transcript page 50)

"3. The trial court erred in holding in its final decree of April 28, 1965, that the Appellee, W. D. Stapelton, Jr., was forever divorced from the Appellant, Evelyn Leak Neeley Stapelton in that such decree was not sustained by the evidence in the case. (Transcript page 50)"

Appellee says that appellant has argued all three assignments in bulk, that assignments 1 and 2 are not good assignments, and, therefore, assignment 3 is not due to be considered, citing Scroggins v. Alabama Gas Corporation, 275 Ala. 650, 657, 158 So. 2d 90, 97, where this court said:

"We have repeatedly held that when unrelated assignments of error are argued together, they are judged by the weakest assignment. In other words, if one assignment is without merit, there is no need to consider the others. (Citations Omitted.) . . . ."

We have held insufficient to present any question for review assignments reciting as follows:

" '2. For that the judgment of the court entered on February 1, 1960 is contrary to the great weight of the evidence.' "

" '3. For that the judgment of the court in favor of the defendant entered on February 1 1960 is contrary to the law in this case.' " Thomas v. Brook, 274 Ala. 462, 463, 149 So.2d 809, 810.

■ Such an assignment is insufficient because it alleges no error committed by the trial court. In assigning errors, appellant must specify the action of the trial court of which he would have review and revision. Kinnon v. Louisville & N. R. Co., 187 Ala. 480, 482, 65 So. 397; Wetzel v. Hobbs, 249 Ala. 434, 31 So.2d 639; Thomas v. Brook, supra.

■ In the instant case, assignments 1 and 2 do not allege that the trial court committed error in any ruling. For that reason, we agree with appellee that assignments 1 and 2 present nothing for review. It seems to us that appellants would be well advised to omit such assignments because they encumber the record and do nothing to benefit an appellant's cause.

In argument in brief, in referring to the assignments, appellant says:

"In our Assignments of Error we have set out that the Court erred in holding in its Final Decree of April 28, 1965, that the Appellee, W. D. Stapleton, Jr., was forever divorced from the Appellant, Evelyn Leak Neeley Stapleton, in that such decree was not sustained by the evidence in the case; that the Appellee failed to prove abandonment as alleged in his Bill of Complaint and that, therefore, such decree was contrary to the evidence and contrary to the laws of the State of Alabama. . . . . "

■ We agree that appellant is arguing all three assignments together in bulk. We do not think, however, that the assignments are unrelated within the meaning of the rule governing bulk argument of assignments of error.

" . . . This Court has consistently held that where several assignments of error are grouped and argued together in brief and one is found to be without merit the Court will not consider the others. First National Bank of Birmingham v. Lowery, 263 Ala. 36(3), 81 So.2d 284. It is there also said that

this principle cannot be evaded by including in brief a request that this Court consider each assignment separately and severally. But where several assignments are governed by the same legal principles and argument, it is not objectionable to argue them in bulk in the brief. Hartford Fire Ins. Co. v. Clark, 258 Ala. 141 (9), 61 So.2d 19; White Dairy Co. v. Sims, 230 Ala. 561, 161 So. 812; City of Montgomery v. Moon, 208 Ala. 472, 94 So. 337." Socier v. Woodard, 264 Ala. 514, 518, 88 So.2d 783, 786.

" . . . . The rule that we consider no assignments of error when more than one are argued together and one is without merit applies only when they are not kindred or related. In Thompson v. State, 267 Ala. 22, 99 So.2d 198, 200, we said: 'When unrelated assignments of error are argued together and one is without merit, the others will not be considered.' In Hartford Fire Ins. Co. v. Clark, 258 Ala. 141, 61 So.2d 19, 27, we said:

" ' * * * Where the assignments of error are so related as that they may be treated as being predicated upon a single argument, the fact they are argued in bulk is not objectionable. But that principle does not apply where the assignments of error are not dependent upon the same legal principles. * * *' "

Southern Electric Generating Co. v. Lance, 269 Ala. 25, 33, 110 So.2d 627, 633.

To like effect are statements by this court in Gilliland & Echols Farm Supply & Hatchery v. Credit Equipment Corp., 269 Ala. 190, 112 So.2d 331, ¶ [8, 9]; Bryan v. W. T. Smith Lumber Co., 278 Ala. 538, 179 So.2d 287, ¶ [3]; City of Trussville v. Porter, 279 Ala. 467, 187 So.2d 224, ¶ [2].

Assignments 1, 2, and 3 in the case at bar are predicated upon a single argument, to wit, that the court erred in granting a divorce to appellee because the evidence does not support a finding that the wife voluntarily abandoned the husband within the requirements as to what must be proved to establish the allegation that the abandonment was voluntary under the statute, § 20, Title 34, Code 1940, as amended by Act No. 463, approved July 10, 1943, General Acts 1943, page 425.

Appellee appears to regard assignment 3 as sufficiently alleging error in the decree of the trial court and we are not advised of any defect in the assignment.

Under the rules stated above, we are of opinion that appellant is entitled to a consideration of assignment 3 although it is argued in bulk with two related assignments which present nothing for review.

We will review the evidence to determine whether it supports a finding that the wife did voluntarily abandon the husband. His testimony is to effect as follows.

He was 53 years old at time of trial and was married to the wife February 2, 1958, in Bay Minette. They lived together three months and ten days until they separated May 12, 1958. They have no children and no joint property.

Both husband and wife are natives of Bay Minette and grew up together. The wife had been married once and divorced prior to the instant marriage, but it was husband's first marriage.

The wife returned to Bay Minette in the early 1950's and husband began to see her at various times and they would go out and eat. He would see her two or three times a week. That went on until they were married.

The wife proposed marriage to the husband three or four times. She obtained the marriage license and arranged for the minister. They were married at the First Methodist Church at 2 p. m. Sunday afternoon and then went home. They had agreed to occupy separate rooms which they did. The husband had three heart attacks prior to the marriage. The husband told the wife he could not be a normal husband to her due to his heart condi-

tion and she said she would not marry him if he could. They occupied separate rooms and never spent any nights together.

The wife was employed in the Probate Judge's office from 8:00 to 4:30. Almost every night, they went out to eat at a restaurant. The wife did not prepare any meals for husband, his father, or herself. On page 14 of the transcript, the husband testified, at close of direct examination:

"Q. All right, will you tell the Court what happened just prior to your separation?

"A. Well, I believe we had been out to dinner and we were sitting in the living room and I asked her if she thought the marriage was working and she said no she didn't think so.

"Q. Did she say anything about leav- at that time?

"A. Yes, 'I will move out tomorrow', she said.

"Q. As a result of that conversation, did she move out?

"A. Not the next day; I was sick the next morning and that postponed her moving for about a week.

"Q. After about a week, and on May 12, 1958, did she move?

"A. Yes.

"Q. Has she returned at any time to the dwelling house where you live?

"A. Oh yes, many, many times.

"Q. But have you all lived together since May 12, 1958, in any way?

"A. No sir.

". . . . . . .

"Q. Mr. Stapleton, if Evelyn, the Respondent, had carried out her promises to you and kept house and looked out after you and your father, and done the normal household duties which a wife is expected to do, would you have agreed to this separation?

"A. No."

The bill of complaint was filed January 2, 1962.

On cross-examination, the husband testified in effect as follows.

Since his mother's death, husband had very seldom had any night meals at home, and, in fact, he ate out most of the time with the wife or other people. The husband testified:

"Q. About the third time Evelyn proposed, did you agree to get married?

"A. When she said: 'Let's try it for three months and if it don't work, we will get a divorce and we will go on being friends' and I did agree.

"Q. You told her it was all right?

"A. Yes.

"Q. Under what arrangement, other than the three months, did you get married?—What did she agree to do for you?

"A. She discussed the financial situation; she said she would be no financial drain on me.

"Q. She had a job of her own?

"A. Yes.

"Q. Working for the Probate Judge from 8:00 A.M. to 5:00 P.M.

"A. Yes.

"Q. She was going to continue to work?

"A. She wanted to.

"Q. You were a little hard up at that time?

"A. Yes."

During the three months and 10 days they lived together, the total sum of money the husband gave to the wife was $10.00 that she asked for. That is the full sum he contributed to her during the time he lived with her.

The husband wanted her to have a separate room because his doctor advised the husband that living intimately with her would probably kill him. The husband had a cook and a houseboy.

It was with husband's consent that wife continued to work after marriage. He bought the groceries. He never gave the wife money to do the marketing but would have if she had asked him. If he desired that she do the marketing, he would have offered her money. He did not particularly want the wife to do any cooking. There was never a cross word between them during the time she was living in the house. He testified:

"Q. You say at the time of the separation, you brought the separation up and told her the marriage was not working?

"A. I asked her.

"Q. What did you think?

"A. I didn't think so.

"Q. And you asked her—What did she say?

"A. 'I don't think so.'

"Q. What did you say when she said 'she didn't think so'?

"A. I said I don't think so either.

"Q. What was said then?

"A. She said, 'since I engineered the whole thing, I will move out tomorrow.'

"    .   .   .   .   .   .   .   .   .

"Q. You say that she didn't move out tomorrow, because you were sick?

"A. That is right.

"Q. How were you sick the next day?

"A. I was bleeding.

"Q. You stayed sick for about a week?

"A. Roughly, yes.

"Q. And she stayed on and looked after you?

"A. She stayed on; my father fixed what I had to eat.

"Q. If she wasn't doing anything, why did she stay on?

"A. I don't know."

The husband still takes her out to dinner two or three nights a week. She came to see him when he was sick. He testified:

"Q. In fact, hasn't she on more than one occasion, suggested to you that you all resume your marriage relations?

"A. Yes.

"Q. And you refused?

"A. I didn't refuse; I told her she had not changed any and I hadn't either.

"Q. How did you know that she had not changed?

"A. I had not seen any evidence of it."

The wife could have planned the meals. He had a woman to cook. He did not ask the wife to quit working and was willing for her to work. He does not really know what he expected the wife to do other than the marketing and supervision of the household and planning meals. She was like a guest in the house and an added burden. She fixed her own breakfast. He cannot think of anything specifically that she agreed to do for him that she did not do. She showed him every courtesy. She suggested coming back and he told her he did not see any point in it because neither one had changed. She spent most of her time at her mother's house when she was not working. He testified:

"Q. DeVan, isn't it true that Evelyn has done everything that a wife

"A. could do for a person in your position and still keep working while you were married?

"A. No, I don't think so. I do think Evelyn is a lovely girl and I am very fond of her.

"Q. You just don't want to be married to her?

"A. That is right.

"Q. And she does want to be married to you?

"A. I can't imagine why.

"Q. It is your belief that she wants to carry out her marriage vows?

"A. . . .

"Q. When the Preacher performed the ceremony there wasn't anything said about three months was there?

"A. No.

"Q. You promised to live with Evelyn and love her and take care of her until death do you all part, did you not?

"A. Yes.

"Q. And she promised to do that with you?

"A. Yes.

"Q. You all both swore to that before the Preacher and before God?

"A. That is right.

"Q. That is right—And yet, because you thought that there was a little something she didn't do, you are willing to break your vows to that Preacher and to God . . .

"A. . . . I don't think she has lived up to our premarital agreement.

"Q. You consider a . . . . You consider the premarital agreement more binding than the vows you took before the Preacher and before God?

"A. I would never have married her if she had not made that.

"Q. You knew you were going to take the vow . . . You have attended weddings and you knew about marriage vows?

"A. Yes.

"Q. Do you take them rather lightly?

"A. No.

"Q. Do you take a marriage vow seriously?

"A. Yes.

"Q. You didn't take your own seriously, did you, Mr. Stapleton?

"A. Well, I was taking our agreement prior to the marriage . . .

"Q. . . . In other words, you sorter had your fingers crossed while you were taking the marriage vows?

"A. Yes."

On re-direct, the husband said the wife did not make any offer to return to him before this suit was filed. On rebuttal, he testified that she asked him to see Mr. Beebe about a divorce and said she was agreeable.

The only other witness was the wife. Her testimony agrees in many respects with that of the husband, but there are some differences. Her testimony is that he said he wanted her to leave.

The question for decision is whether the wife voluntarily abandoned the husband or did she leave with his consent and agreement.

This court has said:

"And 'where the husband assents either expressly or by implication to the separation or to the wife's continued absence, he will not be entitled to a divorce until he has revoked that consent by seeking a reconciliation by something more than a mere request for her return, unaccompa-

nied by an offer in any sense of protection, maintenance, or a home, or a manifestation of any sincere desire to reinstate her to the conjugal relation.' Note to Hill v. Hill, 39 L.R.A.(N.S.) 1117, 1122 (62 Fla. 493, 56 So. 941)." Stone v. Stone, 206 Ala. 568, 569, 90 So. 794, 795.

"It is certainly well said that, if the husband consents to the separation, it is not in legal effect an abandonment of him. (Citations Omitted.)" Higgins v. Higgins, 222 Ala. 44, 45, 130 So. 677, 678.

".   .   .   Whatever may be the effect of the statute when correctly interpreted, it never was the intention of the legislature to detract from the sanctity of the matrimonial contract—to allow husband and wife of their own volition and mutual pleasure, to separate, and at the expiration of the prescribed period of abandonment, to grant a divorce to the party who continued to occupy the premises where they had lived together.   .   .   .   .

\*     \*     \*     \*     \*     \*

".   .   .   Here then is a case in which, although the wife leaves the husband's house, each agrees with the other to dissever their fortunes. It does not establish the allegation that the wife had left the husband's bed and board with intention of voluntary abandonment—it does not put the wife in fault, so as to authorize the husband to demand a divorce.   .   .   .   ." Jones v. Jones, 13 Ala. 145, 147, 148.

■ The burden is on the husband to prove the allegations of his bill of complaint, to wit, that the wife did *voluntarily* abandon him. Gross v. Gross, 265 Ala. 58, 89 So.2d 737.

■ We do not think he proved this allegation. His own testimony on direct examination, quoted above from page 14 of the transcript, is that he would not have agreed to the separation if she had kept house and looked after his father and mother. The inescapable inference from his testimony is that he did agree to the separation.

On cross-examination, he testified, as quoted, that he just did not want to be married to her and that he did not think she had lived up "to our premarital agreement."

In short, his testimony leads us to conclude that he agreed to the separation. There is no testimony that he ever sought a reconciliation.

The husband cites Ex parte Cox, 230 Ala. 158, 160 So. 230, where the trial court found, and this court agreed, that the wife intentionally brought about the separation and that the husband's agreement was the result of her wilful misconduct. This court said that the husband's agreement, thus considered, was not sufficient to cause us to hold that the separation was not an abandonment by her of him.

We do not think the evidence in the instant case shows that the wife intentionally brought about the separation or that it was the result of any misconduct on her part.

"We are reluctant to reverse when the evidence has been taken orally before the trial court, but when, on consideration of the record, we do not find in the evidence sufficient basis for the trial court's decree we have no alternative but to reverse. Such is the case.   .   .   ." Young v. Young, 262 Ala. 254, 257, 78 So.2d 265, 267.

■ Appellant has suggested of record that, since the submission of this cause in this court, appellee has died and that the cause should be revived against his personal representative. In such a case, however, a revivor is not necessary because the decree of this court is effective as from the date of the submission of the cause. Vandiver v. American Can Co., 190 Ala. 352, 67 So. 299; Spira v. Frenkel, 210 Ala. 27, 97 So. 104; Bagwell Steel Co. v. Tinker, 256 Ala.

585, 56 So.2d 114; Land v. Craig, 271 Ala. 580, 126 So.2d 221.

With respect to Cox v. Dodd, 242 Ala. 37, 4 So.2d 736, we have examined the original record filed in this court and find that the record was filed here May 1, 1940; the death of appellant was suggested May 21, 1940; the cause was revived in name of appellant's administratrix and submitted on briefs January 14, 1941. It thus appears that in *Cox*, the party died prior to submission of the cause in this court, whereas, in the case at bar, the party died subsequent to submission in this court. We do not think *Cox* requires revivor in the instant case.

Although the parties have not argued that the instant case is rendered moot by appellee's death, we deem it proper to note that in Cox v. Dodd, this court cited Israel v. Arthur, 6 Colo. 85; 7 Colo. 12, 1 P. 442, where the court held that the death of the husband after a decree of divorce is granted, and before proceedings in error are instituted, does not operate to prevent a review and reversal of the decree where property rights are involved; and also Shafer v. Shafer, 30 Mich. 163, to like effect.

Because we are of opinion that the husband is not entitled to a divorce on the record before us, the decree is reversed and the cause remanded.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON and GOODWYN, JJ., concur.

## ON REHEARING

COLEMAN, Justice.

In support of application for rehearing, appellee argues that we erred on original deliverance in holding that Assignment 3 alleged error sufficiently so as to authorize review.

Appellee says Assignment 3 is almost identical with Assignments 2 and 3 which were held insufficient in Thomas v. Brook, 274 Ala. 462, 149 So.2d 809. In Assignments 2 and 3, in *Brook*, appellant did not allege that the trial court erred. In Assignment 3 in the instant case appellant does allege that "The trial court erred . . . ." In at least this respect, the instant Assignment 3 is distinguished from Assignments 2 and 3 in *Brook*. Whether there are other distinctions we do not decide.

Appellee says further that Assignment 3 in the instant case is insufficient to invite review because of a holding of this court stated as follows:

"Appellant's eighth assignment of error is that 'The Court erred in holding that the evidence introduced by appellee, the Complainant in the Court below, was sufficient upon which the Court could base its decree of August 31, 1962.' Such an assignment of error is entirely too general and presents nothing for review. Bertolla v. Kaiser, 267 Ala. 435, 103 So. 2d 736." Davenport v. Davenport, 276 Ala. 87, 90, 159 So.2d 204, 207.

■ The decree appealed from in *Davenport* is set out in the opinion. The decree contains more than one ruling. For example, the court grants divorce, awards attorney's fee, awards alimony, denies sale of property, and fixes a lien on the husband's property. The eighth assignment was too general because appellant failed, in that assignment, to point out the precise ruling complained of. Where there are several rulings, to any one of which the language of the assignment might equally apply, the assignment manifestly fails to designate the precise error to be reviewed. If the assignment is uncertain and indefinite as to the particular error complained of, this court will decline to consider it. Beasley-Bennett Electric Co. v. Gulf Coast Chapter etc., 273 Ala. 32, 35, 36, 134 So.2d 427.

■ Instant Assignment 3 does point out the precise error complained of, to wit: the holding that the husband was divorced

from the wife. The difference between the assignments is that the eighth assignment in *Davenport* did not point out precisely the error complained of, while Assignment 3 in the instant case does point out precisely the error complained of.

Appellee complains also that we erred in holding that the evidence does not show that the wife intentionally brought about the separation or that it was the result of her misconduct. We undertook to consider the evidence at length on original deliverance and adhere to our original opinion. Further discussion would serve no useful purpose.

Opinion extended.

Application overruled.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.